IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
June 2, 2015 Session


**STATE OF TENNESSEE v. SCOTT L. BISHOP**


**Appeal from the Circuit Court for Madison County
No. 13-86     Donald H. Allen, Judge**

_____


**No. W2014-01540-CCA-R3-CD  -  Filed November 6, 2015**

_____


The Madison County Grand Jury indicted Scott L. Bishop ("the Defendant") with four counts of aggravated sexual battery.  Following a jury trial, the Defendant was convicted as charged, and the trial court ordered concurrent sentences for an effective sentence of eleven years' incarceration.  On appeal, the Defendant argues that: (1) the trial court erred in denying the Defendant's motion for judgment of acquittal; (2) the trial court failed to act as a thirteenth juror; (3) the trial court should have granted the Defendant a new trial based on newly discovered alibi and impeachment evidence; (4) the trial court abused its discretion when it allowed the prosecutor to ask leading questions during the direct examination of the nine-year-old victim; (6) a juror's sleeping during the jury instructions requires a new trial; (7) the sentence imposed by the trial court was excessive; and (8) cumulative error necessitates granting a new trial.  Discerning no error, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J. delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and D. KELLY THOMAS, JR., JJ., joined.

Jeff Mueller (at sentencing and on appeal) and Lee Sparks (at trial), Jackson, Tennessee, for the Appellant, Scott L. Bishop.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Jerry Woodall, District Attorney General; and Shaun Brown, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

## Factual and Procedural Background

*Trial*

**The State's case-in-chief:**

A.B.,[1] the victim, testified that she met the Defendant when she was eight years old, when the Defendant dated her mother for about four months. During that time, the Defendant lived with A.B. and her mother. A friend of A.B.'s mother and the friend's daughter also lived with them.

A.B. recalled that the Defendant "touched [her] privates." She could not recall the exact dates, but she remembered the events took place over four consecutive days in December 2011. On the first occasion, A.B. was playing on the computer in the "computer room" after supper but before her 8:00 p.m. bedtime. The Defendant came into the room, sat in the same chair as A.B., and "touched [her] private." A.B. later explained that the Defendant touched between her legs. The Defendant touched A.B. underneath her clothes for less than a minute. He instructed A.B. not to tell her mother because "he would get in trouble." After the incident, the Defendant left the computer room and went to A.B.'s mother bedroom. A.B. went into the living room. She stated that she did not tell anyone what happened because "[she] didn't know what was happening. [She] was kind of nervous."

The next day, after supper but before A.B.'s 8:00 p.m. bedtime, A.B. and the Defendant were laying under the same blanket on the couch in the living room, watching TV. The Defendant touched A.B.'s "private" between her legs under her clothes for less than a minute. The daughter of A.B.'s mother's friend was also in the living room at this time, but she was "playing with her IPOD" and did not see what happened. When the Defendant stopped what he was doing, A.B. went to her room. The Defendant did not say anything to A.B. on this occasion.

The day after the second incident, A.B. and the Defendant were, again, laying on the couch under the same blanket in the living room watching TV. The Defendant touched A.B.'s "private between [her] legs" underneath her clothes for less than a minute. A.B. reported that this third incident happened after supper but before her 8:00 p.m. bedtime. After the Defendant stopped, A.B. walked away. The Defendant did not say anything to A.B., and no one else was in the living room during this occasion.

---

[1] Consistent with the policy of this court, victims of sexual offenses are identified by their initials.

The day after the third incident, after supper but before A.B.'s 8:00 p.m. bedtime, A.B. and the Defendant were, once again, laying on the couch under the same blanket in the living room watching TV. Again, the Defendant touched A.B.'s "private between [her] legs" underneath her clothes for less than a minute. No one else was in the living room at the time, but A.B.'s mother "peeked over the corner" into the living room and saw what was happening. A.B.'s mother "called [the Defendant's] name," and the Defendant stopped touching A.B. and followed A.B.'s mother out of the living room. The Defendant did not say anything to A.B. on this occasion. Later that night, A.B. told her mother about what had happened over the preceding four days. A.B. stated that the Defendant did not continue to live with them after she told her mother what happened.

On cross-examination, A.B. admitted that she told the interviewer at the Child Advocacy Center that she had never told her mother about what happened with the Defendant. She stated that she had never seen her mother and the Defendant argue before the night of the last incident. A.B. admitted that she had practiced her testimony daily, starting after she began going to counseling sessions. On re-direct examination, A.B. denied fabricating her story. She explained that, when she said she "practiced" her testimony, she simply talked about what happened with different people. She stated that she had talked about the incidents with the "woman at the Child Advocacy Center," the prosecutor, her grandmother, and her mother.

A.B.'s mother testified that, at the time of the offense, she lived in Madison County with A.B., a roommate, and the roommate's daughter. A.B.'s mother reported that she dated the Defendant for about six months in 2011, and the Defendant moved into A.B.'s mother's house in July 2011. December 15, 2011, was "the last night he spent in [A.B.'s mother's] house." On that date, A.B's mother saw the Defendant touch A.B. inappropriately. A.B. was in the living room watching a movie, and A.B.'s mother thought the Defendant was on the computer. However, when A.B.'s mother came into the living room, she saw the Defendant and A.B. on the couch underneath a red blanket. A.B.'s mother observed the Defendant jerk his arm away from the area of A.B.'s vagina "like he'd touched fire." A.B.'s mother screamed at the Defendant and told him to go into her bedroom. A.B. was very upset, crying, and "couldn't actually verbalize anything." A.B.'s mother asked A.B. if the Defendant had touched A.B., and A.B. said yes but did not give details of what happened. When A.B.'s mother confronted the Defendant, he denied it. A.B.'s mother recalled screaming at the Defendant, and she stayed awake that night to make sure he did not leave her bedroom. She did not tell anyone else what happened that night because she was overwhelmed with the situation and was afraid what her family would do if they found out what had happened.

After the Defendant went to work the next morning, A.B.'s grandmother, Pam Priddy, took the Defendant's belongings to his work. A.B.'s mother explained that, at the

time, Ms. Priddy did not know the reason why A.B.'s mother had asked the Defendant to leave. Instead, A.B.'s mother told Ms. Priddy that she and the Defendant "had had issues previously regarding other matters." Eventually, A.B.'s mother told Ms. Priddy what happened between A.B. and the Defendant. However, neither of them called the police because they "wanted it to go away."

After Christmas of that year, A.B.'s mother sought assistance paying her bills from Area Relief Ministries because the Defendant previously paid all the bills. "[I]n a moment of frustration," Ms. Priddy told the lady from the ministry program what happened to A.B., and the lady reported the incident. After that, A.B. and A.B.'s mother spoke with children's services and the police, and A.B. started participating in counseling.

On cross-examination, A.B.'s mother explained that the Defendant paid her bills after he had moved in and found a job. A.B.'s mother denied having disagreements with the Defendant over money and stated that the Defendant always gave her his full paycheck. At some point, A.B.'s mother discovered that the Defendant was "using pills," and it caused some friction in their relationship. A.B.'s mother saw the Defendant approximately two weeks after she discovered him with A.B. when she brought more of the Defendant's personal belongings to his new residence. She admitted that the incidents were not reported until almost two months after they occurred. She further admitted that A.B. did not tell her many details about what happened, but she stated that A.B. confided in Ms. Priddy. On redirect examination, A.B.'s mother said the Defendant looked "completely terrified" when she saw him jerk his arm away from the area of A.B.'s "private parts."

Ms. Priddy testified that she took the Defendant his belongings after A.B.'s mother asked him to leave the house. The next week, Ms. Priddy discovered what happened to A.B. Ms. Priddy explained that she did not report the incidents to the police because she went through a similar experience as a child. She felt that contacting the police would cause A.B. more trauma. Instead, Ms. Priddy counseled A.B. and told her that what happened was not A.B.'s fault, that she was not in trouble, and that she would never have to see the Defendant again.

At some point, Ms. Priddy went with A.B.'s mother to Area Relief Ministries to try to get A.B.'s mother some assistance in paying her bills. Because A.B.'s mother did not have a job at the time, a lady at the ministry told them that A.B.'s mother likely would not get assistance. Ms. Priddy then told the lady "why [A.B.'s mother's] income had stopped so abruptly[,]" and the lady reported the incident to authorities.

On cross-examination, Ms. Priddy admitted that she went to the Defendant's place of employment in March to speak with him under the guise that she had a problem with

her car. When the Defendant had crawled under her car to inspect the alleged problem, she "stomped his privates" and told him that she knew what he had done. Ms. Priddy also admitted that, prior to the Defendant's preliminary hearing, Ms. Priddy took A.B. to her school's book fair and tried to have A.B. tell Jessee Whitnall, a teaching assistant at A.B.'s school, what the Defendant had done to her. However, Mr. Whitnall told A.B. that he did not want to hear the story because "he was done with [the Defendant]." Mr. Whitnall explained that the Defendant's girlfriend had asked him to bail the Defendant out of jail, and Mr. Whitnall refused.

Sergeant Terry Stewart, of the Madison County Sheriff's Department, testified that he was notified about the allegations against the Defendant in January of 2012. As part of his investigation, he sat in on A.B.'s interview at the Child Advocacy Center and met with A.B.'s mother and Ms. Priddy. On cross-examination Sergeant Stewart noted that he spoke with the Defendant at the Defendant's place of employment and that the Defendant was fully cooperative with the investigation.

At the close of the State's case-in-chief, the Defendant moved for a judgment of acquittal, which the trial court denied.

**The Defendant's case-in-chief:**

Mr. Whitnall testified that the Defendant worked for him for five to six years until 2009 and that they were friends. In 2012, Mr. Whitnall worked part-time for the Jackson-Madison County schools as a teaching assistant. In September or October of 2012, Mr. Whitnall was helping with the school book fair when Ms. Priddy and A.B. approached him. Ms. Priddy "shoved" A.B. in front of Mr. Whitnall and said, "You tell Mr. Whitnall what [the Defendant] did to you as we rehearsed." A.B. said she did not want to. Mr. Whitnall responded, "Don't. This is not my business. I don't want to hear it." Ms. Priddy then explained that A.B. had been practicing her testimony two to three times a day and needed "to practice on somebody else." Mr. Whitnall admitted that he told Ms. Priddy that he had ceased all contact with the Defendant.

The Defendant testified that he started dating A.B.'s mother around the end of May 2011 and moved into her house around July 4, 2011. He recalled that, on December 15, 2011, he had an argument with A.B.'s mother about his spending money on pills and not giving A.B.'s mother his entire paycheck. A.B.'s mother did not say anything about the Defendant touching A.B. inappropriately during this argument. The next day, they continued the argument over text messages. The Defendant learned that he was no longer welcome in A.B.'s mother's home when Ms. Priddy came to his work with his stuff. Approximately two weeks later, A.B.'s mother brought pictures of the Defendant's mother and family to his new residence. A.B. was with her on the occasion, but the Defendant did not speak with A.B. In early January, Ms. Priddy came to the Defendant's

place of employment and asked if he and A.B.'s mother could work things out and revive their relationship, but the Defendant told her that would not happen. Neither A.B.'s mother nor Ms. Priddy ever said anything about the Defendant touching A.B. inappropriately. The Defendant did not know about the allegations until he spoke with Sergeant Stewart in March. The Defendant denied touching A.B. inappropriately.

On cross-examination, the Defendant said he did not recall going into the computer room on the day of the first incident. As to the other days, the Defendant stated that he probably was watching TV on the couch with A.B. but they never sat under the same blanket. He said A.B.'s mother did not come into the room, yell at him, or ask him to go to another room on his last night in the house. He maintained that their argument was about pills, and he claimed that he and A.B.'s mother had argued about pills "every few days or so" in the weeks prior to the Defendant moving out of the home.

Kenneth Lilly testified that the Defendant worked for him. Mr. Lilly recalled that Ms. Priddy came to see the Defendant at work in January 2012 and on another occasion "a couple of weeks" prior to that. On cross-examination, Mr. Lilly said he did not recall Ms. Priddy coming to see the Defendant in March 2012. However, he did recall a time when Ms. Priddy came and kicked the Defendant.

**The States' rebuttal proof:**

In her rebuttal testimony, Ms. Priddy denied ever going to the Defendant's place of employment between the time when she delivered his belongings and the time she went to kick him in the groin. She denied going there in January 2012 to speak with the Defendant about rekindling his relationship with A.B.'s mother.

At the close of proof, the jury convicted the Defendant as charged.

*Sentencing Hearing*

At the sentencing hearing, Ms. Priddy testified that A.B. had participated in counseling at the Child Advocacy Center for about a year as a result of the Defendant's actions. Ms. Priddy explained that the experience had affected A.B.'s attitude, stating, "She was very emotional. She is scared to trust anybody." Since the incident, A.B. had lost "that carefree innocence that a child has . . . she doesn't have that carefree laughter. She has had to deal with emotions and a situation that she should never have to deal with especially as a child." Time had allowed A.B. to recover, and she no longer attended counseling. Ms. Priddy described A.B. as "a strong[,] brave girl" and asked the court to give the Defendant a harsh sentence.

On cross-examination, Ms. Priddy admitted that she often discussed the incident with A.B. to help her. Ms. Priddy explained that she asked A.B. about what happened when she initially found out about the incident, but after that, A.B. would bring it up when A.B. wanted to talk about it. Ms. Priddy also admitted that she asked A.B. what she would say during her testimony so that A.B. would be ready to tell her story in front of people, but she denied coaching A.B.

The Defendant submitted four letters written on his behalf. Officer Brad York of the Jackson Police Department testified that he had a second job driving a truck one day a week. He had his truck serviced at the Poplar Corner Exxon, where the Defendant worked. Officer York reported that he visited the station "[a]t least once or twice a week" and that he had known the Defendant for at least a year before the Defendant was incarcerated. He described the Defendant as an honest, "great person" and noted that, when the Defendant repaired his truck, he never had to take it back to be repaired a second time.

Bobbie Bishop, the Defendant's aunt, testified that the Defendant had lived with her after he moved out of A.B.'s mother's house. She stated that he was helpful around the house and appreciative of her family's support. She had never witnessed the Defendant behave violently and stated that she was comfortable with the Defendant living in the home with her adult daughter. She never witnessed him act inappropriately toward children or adult women. She stated that the Defendant was welcome to live with her when he was released.

Tiffany Nadig, the Defendant's girlfriend, testified that the Defendant was a caring and honest person. She reported that the Defendant had informed her of the charges against him on their first date, but she stated that she was not concerned about the Defendant being around her three young children. She had never known the Defendant to do anything "sexually depraved."

Mr. Lilly testified that he owned the Poplar Corner Exxon where the Defendant was employed as a mechanic for approximately two years before his incarceration on the instant charges. Mr. Lilly knew the Defendant struggled with drugs, but he described the Defendant as a good employee. The Defendant had good relationships with customers, and people would request him to fix their cars. He never knew the Defendant to be violent or noticed any sexually inappropriate behavior.

K.C. Lilly testified that he was Mr. Lilly's son and that he often had the Defendant repair his truck. He stated that the Defendant was a "good guy," was honest with customers, and did good work.

Nathan Bishop, the Defendant's uncle, testified that he was aware the Defendant struggled with pills and alcohol, although he had never seen the Defendant under the influence. Prior to coming to live with Mr. Bishop and his wife, the Defendant completed a voluntary, outpatient treatment program. During the time the Defendant lived with Mr. Bishop, he helped clear trees and mow lawns on their fifteen-acre property. Mr. Bishop reported that he had never seen the Defendant behave in a violent manner or exhibit inappropriate sexual behavior.

Kyle Dewberry, a customer at the Poplar Corner Exxon, testified that the Defendant was his "personal mechanic." He did not interact with the Defendant outside of the garage, but he described the Defendant as a friend because they would chat while Mr. Dewberry waited on his car. He said he liked the Defendant and had never observed the Defendant behave violently or in a way that may have been criminal or abnormal.

Mr. Whitnall testified that he had an "excellent" relationship with the Defendant while the Defendant worked for him. He described the Defendant as "a brutally honest and very helpful person." He had never seen the Defendant exhibit any violent behaviors. Mr. Whitnall stated that he started working at A.B.'s school after he retired and that he did not notice anything unusual about the victim's behavior in 2011-2012.

In sentencing the Defendant, the trial court noted that it had considered the testimony presented at trial and at the sentencing hearing. Additionally, the trial court considered the purposes and principles of sentencing as well as arguments from both attorneys. The trial court noted that the Defendant was convicted of having sexual contact with a then-eight-year-old child and that the victim described the Defendant touching her between her legs and under her clothes. Yet, despite the jury's findings, the Defendant's statement for the presentence report said, "I did not have any sexual contact with [A.B.] I have never touched the child. [A.B.'s mother] did this out of spite."

The trial court found the Defendant to be a Range I offender. Additionally, the trial court determined that two enhancement factors applied to the Defendant. First, the Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the range. Specifically, the trial court noted that the Defendant had some prior misdemeanors and that the Defendant was addicted to drugs. The trial court stated that it did not give much weight to the Defendant's prior traffic offenses for enhancement purposes but it placed "great weight" on the Defendant's drug and DUI convictions when weighing the enhancement factors. Additionally, the trial court found that the Defendant had previously failed to comply with the conditions of a sentence involving release into the community because he was on probation for a DUI conviction when the Defendant committed the instant offenses, and the trial court also gave this factor "great weight." The trial court also considered mitigating factors and

found that the Defendant had a good work history and strong community and family support.

The trial court noted that the Defendant would be placed on the sex-offender registry and must submit to DNA testing. The trial court found that the Defendant did not have an extensive criminal history for the purpose of consecutive sentencing, stating that the court has "seen a whole lot worse than [the Defendant's record.]" The trial court considered several other factors but ultimately found that concurrent sentences would be appropriate in this case. Accordingly, after weighing all the applicable factors, the trial court ordered concurrent, eleven-year sentences.

*Motion for New Trial*

The Defendant filed a motion for new trial alleging, among other things, newly discovered evidence. Trial counsel testified that he represented the Defendant through trial. He stated that he met with the Defendant several times and discussed potential witnesses. They also discussed the Defendant's whereabouts on the nights the incidents were alleged to have occurred, but because the allegations were approximately a year and a half to two years old at the time, the Defendant was unable to recall where he was in detail. Consequently, trial counsel was not aware of any alibi witnesses.

Marvin Suggs testified that he knew the Defendant from the Defendant's work as a mechanic at the Poplar Corner Exxon. Mr. Suggs recalled that his fiancée gave birth to their daughter on December 6, 2011. Around 5:30-6:00 p.m. on December 12, 2011, the date listed in the indictment for the first offense, the Defendant and A.B.'s mother came to Mr. Suggs's home to see the baby. The Defendant was still oily from work and was concerned about getting oil on the baby. The Defendant and A.B.'s mother stayed for an hour and a half to two hours and left to go out to eat. Mr. Suggs stated that he remembered the date clearly because, later that night, his fiancée was admitted to the hospital with high blood pressure and stayed there almost two weeks.

Amber Feliciano, Mr. Suggs' fiancée, testified that the Defendant and A.B.'s mother came to visit her home on December 12, 2011, and later that night she was admitted to the hospital. She recalled that they came over between 5:30 and 6:00 p.m. and the Defendant was still dressed in his work clothes. They stayed for "roughly two hours." She stated that the police never talked to her about these events.

Caroline Driver testified that she knew the Defendant through her ex-husband. "[R]ight before Christmas" in 2011, she travelled to Jackson so that her son could see his father and she could collect money from Mr. Driver to help purchase their son's Christmas presents. At the time, the Defendant was staying at Mr. Driver's home because A.B.'s mother had kicked him out of her house. While Ms. Driver was visiting,

she overheard the Defendant on the phone saying, "[Y]ou've got all the money I had. What am I supposed to do?" Shortly after the Defendant hung up the phone, a woman she later learned was A.B.'s mother pulled up to the house in a blue SUV, and the Defendant got into the car. Ms. Driver stated that, based on this interaction, she believed the Defendant and A.B.'s mother were still together as a couple. Ms. Driver admitted that, at the time she observed this interaction, she did not know about the accusations against the Defendant. On cross-examination, Ms. Driver admitted that she did not know who the woman in the car was at the time she saw her. She initially believed that it was Ms. Nadig and did not learn that it was A.B.'s mother until January 2014 when she saw A.B.'s mother in a Wal-Mart. Ms. Driver told Ms. Nadig about her observations, but she did not inform the police or the Defendant's trial counsel.

Trina Lilly testified that the Defendant worked for her husband at the Poplar Corner Exxon. She attended the Defendant's trial and sat in the front row. While the judge was reading the jury instructions, she was "looking around the courtroom" and noticed one of the jurors jerk her head up as if she had fallen asleep. Ms. Lilly stated that she only saw the juror jerk her head like that one time and that the instructions were "just about over" when she saw it. She admitted that she did not know whether the juror had fallen asleep.

Ms. Nadig testified that she attended the Defendant's trial. Near the end of the jury instructions, she twice saw a juror "nod[] off" and then jerk her head as if she had fallen asleep. Ms. Nadig stated that the juror "looked like she was exhausted and bored and tired." After she "nodded off," the juror "put her head on her arm like propping herself up." Ms. Nadig told trial counsel about her observations after trial. Ms. Nadig admitted that she never spoke to the juror in question and did not know if the juror was listening to the instructions. Ms. Nadig informed trial counsel of what she saw "[r]ight after the trial."

In a written order, the trial court denied the Defendant's motion for new trial. In that order, the trial court found that the evidence was sufficient to support the jury's verdict for all four counts and that the result "was not against the weight of the evidence in this case." Additionally, the trial court found that the proof was sufficient to show that the Defendant touched A.B.'s "intimate" parts when A.B. testified that the Defendant touched her private part between her legs and A.B.'s mother testified that she saw the Defendant jerk his hand away from the area of A.B.'s vagina.

The trial court also found that the testimony of Ms. Driver, Mr. Suggs, and Ms. Feliciano did not constitute "newly discovered evidence," noting that the Defendant made no alibi claim at trial and "the [D]efendant would have had knowledge of his own presence or 'lack of presence' at the scene of the incidents on the [four] nights alleged in the indictment." Further, the trial court found that both the Defendant and trial counsel

should have known about any alibi witnesses. Moreover, the Defendant admitted at trial that he was at A.B.'s mother's home on each night alleged in the indictment, and the new witnesses' testimony was not so material that its introduction would have likely changed the result at trial.

As to the allegation that a juror fell asleep during the jury instructions, the trial court stated,

> [N]o juror ever "nodded off" or "fell asleep" during any portion of the trial. The Court is very attentive and is purposefully watchful of all jurors throughout the entire trial proceeding and throughout the reading of the Jury Instructions by the Court. The Court is keenly aware of the importance of each juror's attentiveness. The Court does not credit the testimony of Trina Lilly or Tiffany Nadig with regard to a juror sleeping during any portion of the Jury Instruction.

Finally, the trial court found that the State's questioning of its witnesses was not improper and the effective eleven-year sentence was not excessive. This timely appeal followed.

## Analysis

### *Motion for Judgment of Acquittal*

On appeal, the Defendant argues that the trial court erred when it denied the Defendant's motion for a judgment of acquittal at the conclusion of the State's case-in-chief. Because the Defendant offered evidence in support of his defense rather than rest his case, he has waived this issue for purposes of appellate review. See State v. Blanton, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996).

### *Thirteenth Juror*

The Defendant argues that "the weight of the evidence does not justify the verdict of the jury." Specifically, the Defendant claims that the evidence "does not rise to the level of beyond reasonable doubt and to a moral certainty." In connection with his argument about the weight of the evidence, the Defendant contends at several points in his brief that A.B.'s testimony was rehearsed and therefore was unreliable. Additionally, the Defendant argues that the State failed to prove unlawful sexual contact when A.B. described the Defendant touching her "private area." The State contends that the trial court properly served as the thirteenth juror and approved the jury's verdict and that the evidence was sufficient to support the jury's verdict. We agree with the State.

Rule 33(d) of the Tennessee Rules of Criminal Procedure states, "The trial court may grant a new trial following a verdict of guilty if it disagrees with the jury about the weight of the evidence." This rule is the modern equivalent of the "thirteenth juror rule" and requires the trial court to weigh the evidence and grant a new trial "if the evidence preponderates against the weight of the verdict." Blanton, 926 S.W.2d at 958. Our supreme court has stated that this rule "imposes upon a trial court judge the mandatory duty to serve as the thirteenth juror in every criminal case[] and that approval by the trial judge of the jury's verdict as the thirteenth juror is a necessary prerequisite to imposition of a valid judgment." State v. Carter, 896 S.W.2d 119, 122 (Tenn. 1995). When a trial judge overrules a motion for new trial, absent any evidence that that the trial court expressed dissatisfaction or disagreement with the weight of the evidence or the verdict, this court presumes that the trial judge has served as the thirteenth juror and approved the jury's verdict. Id. Once the trial court fulfills its duty as the thirteenth juror and imposes a judgment, appellate review is limited to determining the sufficiency of the evidence. State v. Moats, 906 S.W.2d 431, 435 (Tenn. 1995) (citing State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993)).

In the order denying the Defendant's motion for new trial, the trial court explicitly stated, "[T]he evidence was sufficient to support the four separate convictions for [a]ggravated [s]exual [b]attery, and . . . the [j]ury's verdict of guilty as to each of the [four] counts of [a]ggravated [s]exual [b]attery was not against the weight of the evidence in this case." Accordingly, it is clear that the trial court considered the evidence as the thirteenth juror and approved the jury's verdict. Therefore, we review the record to determine the sufficiency of the evidence.

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight and value of the evidence are resolved by the fact finder. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978), superseded on other grounds by Tenn. R. Crim. P. 33 as stated in Moats, 906 S.W.2d at 434 n.1. This court will not reweigh the evidence. Id. Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. Bland, 958 S.W.2d at 659; Tuggle,

639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." State v. Vasques, 221 S.W.3d 514, 521 (Tenn. 2007).

As charged in the indictment, aggravated sexual battery is defined as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [and] [t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (2010). "Sexual contact" is defined as "the intentional touching of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (2010). "'Intimate parts' includes the primary genital area, groin, inner thighs, buttock or breast of a human being." Tenn. Code Ann. § 39-13-501(2) (2010).

At trial, A.B. testified that, on four consecutive days in December 2011, the Defendant placed his hand underneath her clothes and touched her "private part between her legs." Additionally, A.B.'s mother testified that, on the night of December 15, 2011, she looked into the living room and saw the Defendant jerk his arm away from the area of A.B.'s vagina "like he'd touched fire." Such testimony was sufficient to allow a rational juror to conclude that the Defendant had touched A.B.'s "primary genital area, groin, inner thighs, [or] buttock[.]" See id. The record clearly establishes that A.B. was under the age of thirteen at the time of the incidents. Furthermore, on the night of the first incident, the Defendant instructed A.B. not to tell anyone about what happened because he could get into trouble. A rational juror could conclude that the Defendant touched A.B. for the purpose of sexual arousal or gratification. Finally, the Defendant cross-examined several witnesses about A.B. rehearsing her testimony. Despite hearing this testimony, the jury accredited A.B.'s account of events, and we will not disturb their credibility determination on appeal. See Cabbage, 571 S.W.2d at 835. Accordingly, we conclude that the evidence was sufficient to support the Defendant's convictions for aggravated sexual battery.

*"Newly Discovered" Evidence*

The Defendant argues that the testimonies of Mr. Suggs, Ms. Feliciano, and Ms. Driver constitute newly discovered evidence that necessitates granting a new trial. Specifically, he claims that Mr. Suggs and Ms. Feliciano's testimony showed that the Defendant was not in A.B.'s mother's home at the time A.B. claimed the first incident occurred and therefore established an alibi for the Defendant for the first incident. Further, the Defendant claims that Mr. Suggs and Ms. Feliciano's testimonies would allow the jury to "doubt the veracity of the allegations contained in the other counts." As to Ms. Driver, the Defendant contends that her testimony is "totally at odds" with A.B.'s mother's testimony, and as such, the introduction of Ms. Driver's testimony was crucial to impeach A.B.'s mother.

- 13 -

When seeking a new trial based on newly discovered evidence, the defendant must establish "(1) reasonable diligence in attempting to discover the evidence; (2) the materiality of the evidence; and (3) that the evidence would likely change the result of the trial." State v. Caldwell, 977 S.W.2d 110, 116 (Tenn. Crim. App. 1997) (citing State v. Nichols, 877 S.W.2d 722, 737 (Tenn. 1994)). In order to show reasonable diligence, the defendant must demonstrate that neither he nor his counsel had knowledge of the alleged newly discovered evidence prior to trial. Id. at 117. A trial court should not order a new trial based on newly discovered evidence that is offered only to "discredit the testimony of a witness at the original trial, contradict a witness' statements or impeach a witness . . .'unless the testimony of the witness who is sought to be impeached was so important to the issue, and the evidence impeaching the witness so strong and convincing that a different result at trial would necessarily follow.'" Id. (quoting State v. Rogers, 703 S.W.2d 166, 169 (Tenn. Crim. App. 1985)). Whether to grant a new trial based on newly discovered evidence rests within the sound discretion of the trial court. Id.

Mr. Suggs and Ms. Feliciano testified that the Defendant and A.B.'s mother arrived at their house around 5:30 or 6:00 p.m. on the evening of December 12, 2011, and stayed for about an hour and a half to two hours before they left to get dinner. Neither witness testified as to the Defendant's whereabouts on December 13, 14, or 15, 2011. Further, both A.B. and A.B.'s mother testified that they were home on the day of each incident. At trial, the Defendant denied touching the victim but did not claim he was outside of the house on the day of each incident. In denying the motion for new trial, the trial court found that the evidence was not newly discovered because "the [D]efendant would have had the knowledge of his own presence or 'lack of presence' at the scene of the incidents on the [four] nights alleged in the indictment" (emphasis in original). Additionally, the trial court found that Mr. Suggs and Ms. Feliciano's testimony was not material enough to change the result of the trial because it only addressed one of the dates alleged in the indictment. The Defendant has failed to establish that the trial court abused its discretion when it denied a new trial based on the testimony of Mr. Suggs and Ms. Feliciano.

Ms. Driver testified that, on December 22, 2011, she overheard the Defendant arguing with someone on the phone about money and that she saw the Defendant speak with a woman she later learned was A.B.'s mother. Ms. Driver said that it appeared that the two were in a relationship at that time. The trial court found that Ms. Driver's testimony was not newly discovered evidence and that the Defendant did not establish that it was material evidence that would have likely changed the result of the trial. The Defendant would have known that Ms. Driver was present when A.B.'s mother appeared at the house and, with reasonable diligence, could have located Ms. Driver prior to trial. Furthermore, in his brief, the Defendant acknowledges that the only purpose of Ms. Driver's testimony would be to impeach the testimony of A.B.'s mother. Whether the

- 14 -

Defendant and A.B.'s mother were together at this point in time is immaterial to the issues at trial and, as such, Ms. Driver's testimony would not have likely changed the result at trial. The trial court did not abuse its discretion when it denied a new trial based on Ms. Driver's testimony. The Defendant is not entitled to relief.

*Leading Questions in A.B.'s Direct Examination*

The Defendant argues that A.B.'s testimony was not her own because the prosecutor was allowed to ask leading questions. The State argues that the prosecutor's questions were necessary to develop the testimony of the nine-year-old witness. We agree with the State.

Initially, we note that the Defendant concedes we must review this issue for plain error. At trial, the Defendant's counsel objected only once to a leading question from the prosecutor, and the trial court asked the prosecutor to rephrase his question. No other objections were made as to leading questions.[2] Rule 36(a) of the Tennessee Rules of Appellate Procedure states that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "The failure to make a contemporaneous objection constituted waiver of the issue on appeal." State v. Gilley, 297 S.W.3d 739, 762 (Tenn. Crim. App. 2008). However, "when necessary to do substantial justice," this court may "consider an error that has affected the substantial rights of a party" even if the issue was waived. Tenn. R. App. P. 36(b). Such issues are reviewed under plain error analysis. State v. Hatcher, 310 S.W.3d 788, 808 (Tenn. 2010).

Plain error relief is "limited to errors that had an unfair prejudicial impact which undermined the fundamental fairness of the trial." State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994). In order to be granted relief under plain error relief, five criteria must be met: (1) the record must clearly establish what occurred in the trial court; (2) a clear and unequivocal rule of law must have been breached; (3) a substantial right of the accused must have been adversely affected; (4) the accused did not waive the issue for tactical reasons; and (5) consideration of the error is "necessary to do substantial justice." Adkisson, 899 S.W.2d at 640-41; see also State v. Smith, 24 S.W.3d 274, 282-83 (Tenn. 2000) (Tennessee Supreme Court formally adopting the Adkisson standard for plain error relief). When it is clear from the record that at least one of the factors cannot

---

[2] We also note that this issue is subject to waiver because the Defendant failed to include in his brief any citations to the record identifying objectionable, leading questions. See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citations to authorities, or appropriate references to the record will be treated as waived in this court.") However, because the State does not make a waiver argument, we will examine the entirety of A.B.'s direct examination and address the merits of the Defendant's claim under plain error review.

be established, this court need not consider the remaining factors. Smith, 24 S.W.3d at 283. The defendant bears the burden of persuasion to show that he is entitled to plain error relief. State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007).

Tennessee Rule of Evidence 611 grants the trial court wide discretion in controlling the presentation of evidence, including the use of leading questions on direct examination to develop a witness's testimony. This court has already determined that trial courts may permit leading questions of a child sex offense victim on direct examination "when necessary to fully develop the witness's testimony." State v. Jonathan Ray Swanner, No. E2010-00956-CCA-R3-CD, 2011 WL 5560637, at *6 (Tenn. Crim. App. Nov. 14, 2011), perm. app. denied (Tenn. Mar. 7, 2012) (citing Swafford v. State, 529 S.W.2d 748, 749 (Tenn. Crim. App. 1975)).

In this case, the record clearly establishes that the questions in A.B.'s direct examination were intended to develop her testimony. A.B., who was nine years old at the time of trial, often responded to questions with one-word answers or by shaking or nodding her head. Further, the prosecutor's questions were in no way suggestive. Accordingly, we do not believe a clear and unequivocal rule of law was breached. Moreover, the Defendant has failed to establish that he did not object to the prosecutor's questions for tactical reasons. Accordingly, the Defendant is not entitled to relief under plain error.

*Juror Allegedly Sleeping During Jury Instructions*

The Defendant argues that the jury's verdict may be impeached as "a quotient or gambling verdict" because one of the jurors allegedly fell asleep while the jury instructions were being read. The State argues that the Defendant waived this issue by failing to make a contemporaneous objection and that he is not entitled to plain error relief.

Initially, we note that there is nothing in the record that indicates trial counsel was aware that a juror may have fallen asleep until Ms. Nadig informed him of such after the trial. The Defendant then raised the issue of the sleeping juror in his motion for new trial. Accordingly, we do not believe the Defendant waived the issue by failing to make a contemporaneous objection because he raised the issue at the first available opportunity after learning that an error may have occurred. See Tenn. R. App. P. 36(a).

The Defendant has failed to establish that a juror allegedly falling asleep during jury instructions entitles him to relief. "Whether a juror was asleep or otherwise inattentive at some time during trial is a question for the trial judge in his discretion to resolve." Gary Bernard Sanders v. State, No. 02C01-9206-CR-00137, 1994 WL 111080, at *4 (Tenn. Crim. App. Mar. 30, 1994), perm. app. denied (Tenn. Oct. 3, 1994). The

mere fact that a juror becomes drowsy, absent a showing that the defendant was prejudiced, is not itself grounds for a new trial. State v. Chestnut, 643 S.W.2d 343, 346 (Tenn. Crim. App. 1982). Instead, the defendant must show that the juror's lack of attention caused the juror to "fail[] to follow some important or essential part of the proceedings." Id.

In this case, the Defendant has failed to demonstrate that the juror fell asleep. Both Ms. Nadig and Ms. Lilly testified that they saw one of the jurors "nod[] off" and jerk her head upward near the end of the jury instructions. However, neither could definitively determine whether the juror was, in fact, sleeping. Additionally, the trial court explicitly discredited Ms. Nadig's and Ms. Lilly's testimony and stated that it purposefully watched all the jurors during the reading of the jury instructions and that "no juror ever 'nodded off' or 'fell asleep' during any portion of the trial." We find no abuse of discretion by the trial judge in his decision that the juror did not sleep.

Even assuming the juror did fall asleep, it was only for a moment at the end of the jury instructions. Written copies of the jury instructions were given to the jurors to take into the jury room during deliberations, and nothing in the record indicates that the jury failed to follow those instructions. Thus, the Defendant has also failed to establish that he was prejudiced by the juror's alleged lack of attention and is not entitled to relief.

The Defendant also asserts that the verdict may be impeached as a "quotient or gambling verdict" and cites Tennessee Rule of Evidence 606(b) to support his claim. That rule allows a juror to testify "on the question of whether extraneous prejudicial information was improperly brought to the jury's attention, whether any outside influence was improperly brought to bear upon any juror, *or whether the jurors agreed in advance to be bound by a quotient or gambling verdict without further discussion*[.]" Tenn. R. Evid. 606(b) (emphasis added). There is no evidence in the record that the jurors agreed in advanced to be bound by a quotient or gambling verdict without further discussion. Therefore, the Defendant's claim that the jury's verdict may be impeached as quotient or gambling verdict is wholly without merit.

*Sentencing*

The Defendant claims that his eleven-year sentences were excessive because they were three years higher than the "presumptive minimum" sentence[3] of eight years. To

---

[3] We noted that the 2005 amendments to the Sentencing Reform Act of 1989 "changed the method of fixing the length of a sentence within the appropriate range by 'remov[ing] the prior rule, that absent an enhancement [factor], a judge may not impose a sentence that exceeds the presumptive sentence' and instead allowing 'the judge [to] sentence anywhere within the appropriate range.'" State v.

support this claim, the Defendant argues that the trial court erred when it placed "great weight" on the enhancement factors that the Defendant had prior criminal convictions related to drug and alcohol abuse and that the Defendant was on probation for a DUI at the time he committed instant offenses. Additionally, the Defendant contends that the trial court should have given more weight to the mitigating factors.

Contrary to the Defendant's assertion that this court reviews sentencing decisions under a de novo standard, this court applies an abuse of discretion standard with a presumption of reasonableness when the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act." State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" State v. Shaffer, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting State v. Moore, 6 S.W.3d 235, 242 (Tenn. 1999)).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210; State v. Taylor, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103 (2010).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2010); Bise, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." Bise, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401 (2010), Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

---

Caudle, 388 S.W.3d 273, 278 (Tenn. 2012) (quoting David L. Raybin, The *Blakely* Fix: New Tennessee Law Restores Judicial Discretion in Criminal Sentencing, 41 Tenn. B.J. 14, 16 (2005)).

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c) (2010).

Although the trial court should also consider enhancement and mitigating factors, such factors are advisory only. See Tenn. Code Ann. § 40-35-114 (Supp. 2013); see also Bise, 380 S.W.3d at 699 n.33, 704; Carter, 254 S.W.3d at 345. We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343. A trial court's "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. "[Appellate courts are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Carter, 254 S.W.3d at 346.

In this case, the Defendant was convicted of a Class B felony as a Range I offender. Therefore, the applicable sentencing range was eight to twelve years. Tenn. Code Ann. § 40-35-112(a)(2) (2010). The trial court considered the principles and purposes of sentencing as well as applicable enhancement and mitigating factors. The trial court sentenced the Defendant within the applicable range and explained on the record the factors it considered as well as its reasons for imposing the sentence. The Defendant has failed to establish that the trial court abused its discretion when it sentenced the Defendant to eleven years for each conviction. Therefore, the Defendant is not entitled to relief.

*Cumulative Error*

Finally, the Defendant argues that the cumulative effect of the errors violated his right to a fair trial. The cumulative error doctrine recognizes that there may be many errors committed in trial proceedings, each of which constitutes mere harmless error in isolation, but "have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial." State v. Hester, 324 S.W.3d 1, 76

(Tenn. 2010).  To warrant review under the cumulative error doctrine, there must have been more than one actual error during the trial proceedings.  <u>Id.</u> at 77.  In this case, the Defendant has failed to establish a single error at trial.  Therefore, he is not entitled to relief.

## <u>Conclusion</u>

For the aforementioned reasons, the judgments of the trial court are affirmed.

_____

ROBERT L. HOLLOWAY, JR., JUDGE